**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Ambient Corporation,[1] | Case No.: 14-11791 (___) |
| Debtor. | |

**DECLARATION OF JOHN J. JOYCE IN SUPPORT OF**
**CHAPTER 11 PETITION AND RELATED MOTIONS**

Pursuant to 28 U.S.C. § 1746, John J. Joyce declares as follows:

1.      I am at least 21 years of age and am competent to give this declaration.  I have knowledge of the matters to which I hereinafter depose, except where otherwise stated.  I have also reviewed the records, press releases and other relevant documents of the above-captioned debtor and debtor-in-possession (the "Debtor") and have spoken with certain directors, officers and/or employees of the Debtor, as necessary, and where I have relied upon such information do verily believe such information to be true.

2.      I am the Chief Executive Officer and Authorized Representative of the Debtor, a corporation organized under the laws of the state of Delaware.  I am also a director of the Debtor and serve as chairman of the board of directors.  I have been a member of the Debtor's management team since 2000.  I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtor.

3.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtor will continue to operate its businesses and manage it properties as a debtor-in-possession.

---

[1] The last four digits of the Debtor's tax identification numbers are 6007.  The address of the Debtor's corporate headquarters is 7 Wells Avenue, Suite 11, Newton, Massachusetts 02459.

4.    I submit this First Day Declaration on behalf of the Debtor in support of (i) the Debtor's voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), and (ii) the Debtor's "first-day" motions (collectively, the "First Day Motions").  The Debtor seeks the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of this chapter 11 case (the "Chapter 11 Case") on its business.  I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the continued survival of the Debtor and the success of this Chapter 11 Case.

## I.    INTRODUCTION

5.    Founded in 1996, the Debtor is a leading communications and applications platform supplier to utilities and infrastructure owners.  As described in greater detail below, the Debtor is facing a severe liquidity crisis as a result of, among other things:  (i) increased competition and (ii) the unsuccessful monetization of growth opportunities.  As a result, the Debtor is in danger of failing to meet various covenants and other obligations with its secured lender and does not have the liquidity needed to meet ongoing payment and operating obligations.

6.    The Debtor is in the process of completing an extensive marketing process for the sale of its businesses.  The Debtor began searching for strategic alternative partners and exploring other options in 2011. While promising, the Debtor's efforts were largely unsuccessful until recently.  As described in further detail below, the Debtor has entered into a stalking horse purchase agreement with a potential purchaser, Ericsson Inc. ("Ericsson" or the "Stalking Horse Purchaser") and intends to seek approval of certain

bid protections and bidding procedures to complete the final stages of this marketing process to ensure that the Debtor realizes the highest and best value for its assets.

7.    This Chapter 11 Case will allow the Debtor to maintain its operations while providing the necessary time to complete the current sales process for the benefit of stakeholders.  Absent the protections of the Bankruptcy Code, the Debtor will run out of cash, shut down its operations, and liquidate, all to the detriment of the Debtor's employees, customers, suppliers, and creditors.

8.    In order to finance the continued operations of the Debtor during the completion of the marketing process, the Debtor's prepetition lender, Vicis Capital Master Fund ("Vicis" or the "Prepetition Lender"), extended the maturity date of the Debtor's prepetition secured financing facility (the "Prepetition Facility") from June 30, 2014, to September 30, 2014.  Additionally, the Stalking Horse Purchaser has agreed to provide the Debtor with debtor-in-possession funding up to $2.5 million pursuant to the DIP Credit Agreement (as defined below).  The Stalking Horse Purchaser intends to credit bid the amount drawn by the Debtor under the DIP Credit Agreement in connection with any sale of the Debtor's assets, which credit bid will reduce the amount owed by the Stalking Horse Purchaser at closing in respect of the $7.5 million purchase price agreed to by the Debtor and the Stalking Horse Purchaser.  If the DIP Credit Agreement is approved by the Court, the Debtor will be able to draw a limited amount of funding immediately upon issuance of an interim order approving the DIP Credit Agreement. The Debtor will seek approval of the DIP Credit Agreement, including a lien on the proceeds of avoidance actions and a release and waiver of certain rights in favor of the Stalking Horse Purchaser, as the Debtor's lender, and the Prepetition Lender.  I believe

the Debtor would be forced to immediately cease operations and liquidate its assets absent (i) the Prepetition Lender's agreement to extend the maturity date under the Prepetition Facility and (ii) access to the anticipated availability under the DIP Credit Agreement.

9.      The board of directors of the Debtor has authorized the filing of this Chapter 11 Case to pursue a sale of the Debtor's assets given the Debtor's inability to independently survive as a going concern.

## II.      BACKGROUND OF THE DEBTOR

### A.      Business Operations

10.     Debtor Ambient Corporation was founded as a Delaware corporation in 1996.  In August 1996, the Debtor purchased substantially all of the assets of Gen Technologies ("GTI"), including the capital stock of GTI's subsidiary, Gentech, Ltd., a corporation formed under the laws of Israel.  The Debtor changed the name of the Israeli subsidiary to Ambient, Ltd., and subsequently wound down that entity.  Until recently, the Debtor's common stock traded on the NASDAQ exchange.

11.     The Debtor operates in the utilities industry, specifically in the development and maintenance of "smart grid" technology with a focus on three interrelated business segments: (i) communications nodes, (ii) communications network software, and (iii) maintenance services.  Collectively, the Debtor's communication nodes and network software form the basis of the Ambient Smart Grid®, products and technologies designed to assist grid mangers and utilities by upgrading their power grids. In order to protect its technologies and other proprietary information, the Debtor relies on a combination of valuable intellectual property.  As of October 17, 2013, the Debtor had

22 registered U.S. patents,[2] 44 international patents, 4 pending patents, and 14 registered trademarks.

12.    The Debtor owns 100% of the stock of Ambient Corporation Europe Limited ("Ambient UK"), a non-debtor and the only subsidiary of the Debtor. Ambient UK is a shell company with no assets or operations and was established solely to facilitate the payroll for two international salespersons hired by the Debtor. The Debtor is currently in the process of winding down Ambient UK. As of the Petition Date, the two employees continue to perform their duties at the request and at the instruction of the Debtor and report directly to the Debtor's management.[3]

13.    The Debtor currently leases an approximately twenty-one thousand square foot headquarters in Newton, Massachusetts. All operational and accounting functions are completed at or coordinated from the Newton headquarters. The Debtor relies on third parties to manufacture, ship, and distribute substantially all of the products purchased by the Debtor's customers.

14.    In fiscal year 2013, the Debtor generated pretax net loss of $17,737,000 on net sales of $11,350,000. Cash flow from operations during the same period totaled negative $12,271,000. As of March 31, 2014, the Debtor had negative working capital of $4.6 million. For the quarter ending March 31, 2014, the Debtor had negative cash flows from operations of $1.9 million and had suffered a net loss of $3.8 million.

15.    As indicated above, the Debtor focuses on three interrelated business segments within the efficient infrastructure industry.

---

[2] As of the Petition Date, the Debtor had 25 registered U.S. patents and 4 U.S. patent applications pending.
[3] One of the two Ambient UK employees will cease employment effective September 2014.

The "Smart-Grid"

16.    The term "smart grid" refers to the use of advanced technologies to upgrade the electric power grid by making the grid more intelligent and efficient. A number of factors are increasingly straining the current grid, which was largely designed and built decades ago, including growing electricity demand, two-way power flow requirements, advanced pricing plans, and the implementation of renewable and distributed energy sources. Smart grid technology, such as the Debtor's products and services, brings utility delivery systems into the modern age by implementing two-way communication between utility providers and end-users, between disparate devices attached to the grid, and by installing computer processing systems designed to collect and compute the flow of data. By modernizing the grid, the Debtor's products and services deliver significant benefits to utilities and energy consumers.

The Debtor's Communications Nodes

17.    The Debtor's series of communications nodes are physical boxes that contain the hardware and software needed for communications and data collection in support of grid assets, such as smart meters and distribution automation devices. Smart meters record and monitor real-time energy consumption and allow for two-way communication of data between the meter and a utility's back office. Distribution automation devices, on the other hand, control energy distribution in real-time to promote intelligent grid control. The Debtor's nodes, currently in their fourth generation, operate as individual data collection points and processors, which receive signals from other networked devices such as a provider's smart meters and distribution automation sources.

Historically, the sale of nodes has accounted for a significant portion of the Debtor's revenue.

The Debtor's Communications Network Software

18.     To facilitate the interoperability and maximize the benefit of smart grid applications (such as the Debtor's nodes), a flexible and open communications platform is needed.  The Debtor's network or node management system, AmbientNMS® (the "Network"), manages large numbers of communications nodes and other devices, effectively providing utility providers valuable information on a single software system. The Network can be configured to meet the needs of any type of customer.

19.     When integrated into a provider's grid, the Debtor's smart grid offerings provide a secure two-way, flexible, and open Internet Protocol architecture that efficiently networks smart grid applications and different technologies within each application for data transmission and collection purposes.  For example, the Network supports multiple communications technologies such as Wi-Fi, radio frequency, cellular technologies, power line communications, serial, and Ethernet, and can be configured as a single communications infrastructure for a utility provider to support smart metering, distribution automation, distribution management, demand response, and distributed generation.

20.     The Network is customized to meet the customer's needs with respect to the monitoring and processing of information on a real-time basis.  For example, the Debtor has successfully integrated its Network to work with an industry standard Distribution and Outage Management System, providing for the delivery of faster and more accurate information to power outage notification and restoration systems.  The

Network also allows grid managers to systematically push software updates to deployed communications nodes and other downstream devices directly from a single source.

The Debtor's Maintenance and Consulting Services

21.     In addition to its communications nodes and Network products, the Debtor offers maintenance and implementation services to maintain Ambient Smart Grid® products.  The Debtor is capable of remotely distributing software upgrades and added features to deployed nodes.  The Debtor also offers consulting services related to product development, network management, and smart grid deployment strategies.

**B.     Corporate Structure**

22.     The chart attached hereto as Exhibit A reflects the corporate group structure of the Debtor.  Specifically, Debtor Ambient Corporation owns 100% of Ambient UK.

23.     Since its inception, the Debtor has funded operations with proceeds from the sale of securities and, from 2010, with revenue from sales of products.  As of May 14, 2014, the Debtor had 17,480,977 shares of common stock, par value $0.001 per share, traded on the NASDAQ exchange.  The Debtor's common stock was delisted on July 21, 2014, for failure to comply with NASDAQ's minimum stockholders' equity requirement. The stock is currently trading on the Pink Sheets.

24.     Since 2012, the Debtor has experienced a decrease in revenue, negative cash flows from operations, and a net loss. Beginning in May 2013, in an effort to preserve working capital, the Debtor implemented a series of restructuring measures, principally reduction of its workforce.

25.     Additionally, in August 2013, the Debtor entered into the Prepetition Facility with its largest shareholder, Vicis,[4] pursuant to which Vicis agreed to fund up to $5 million to the Debtor, in increments of $500,000, whenever the Debtor's available cash on hand fell below $500,000 prior to June 30, 2014.[5]  In exchange for each $500,000 draw, the Debtor issued a corresponding note to Vicis bearing 12% interest per annum and secured by a first lien on all of the Debtor's assets.

26.     As of the Petition Date, the Debtor had no remaining availability under the Prepetition Facility.  The Prepetition Facility is the Debtor's only secured debt.  I believe that the Prepetition Facility is a legal, valid, and binding obligation of the Debtor.  I further believe that, in connection with the DIP Financing Motion, the Debtor's waiver and release of any and all claims against the Prepetition Lender, including any recharacterization, subordination, or avoidance claims, is supported by the facts.

### C.    Employees

27.     As of the Petition Date, the Debtor employs approximately 33 employees (collectively, the "Employees").  Of the 33 Employees, 31 are salaried and 2 are hourly. The Employees are paid bi-weekly not in arrears, with the exception of two hourly-based employees that are paid four days in arrears.  The Debtor uses third parties to process the payroll for the Debtor's Employees and the two salespersons employed by Ambient UK. The Debtor's average payroll obligation is approximately $148,000 per pay period.  The Debtor's Employees are not affiliated with a union and are not parties to a defined benefit plan.

---

[4] Vicis currently holds 57.8% of the Debtor's common stock.
[5] The Vicis facility was originally set to expire on June 30, 2014, but in connection with the Debtor's sale process, Vicis agreed to extend maturity until September 30, 2014.

28.     The Debtor's workforce is skilled and possesses great familiarity with the Debtor's operations and product lines.  I believe that the Debtor's Employees are critical to continued operations and the Debtor's ability to preserve, maximize, and ultimately realize the value of its business as a going concern.

### D.     Cash Management System

29.     As of the Petition Date, the Debtor, in the ordinary course of its business, maintains a single bank account (the "Account") at Bank of America.  The Debtor facilitates all of its operations through the Account, including inbound and outbound wires, payroll, checks, cash disbursements, cash receivables, and all other payables and receivables.  The Account enables the Debtor to collect, transfer, and disburse funds as needed, and to accurately record all such transactions as they are made.  In order to minimize the disruption caused by this bankruptcy filing and maximize the value of its estate in this chapter 11 proceeding, it is vital that the Debtor maintain its current Account and system for managing its cash.

### III.    EVENTS LEADING TO THE DEBTOR'S CHAPTER 11 CASES

30.     The Debtor has experienced strained liquidity and a rapid decline in EBITDA in recent years as a result of, *inter alia*, increased competition in the market and the unsuccessful monetization of growth opportunities.  Since 2005, the Debtor's largest customer has been Duke Energy ("Duke").  Duke is a Fortune 250 company and the largest electric power holding company in the United States, supplying and delivering energy to approximately 7.2 million U.S.-based customers.  Collectively, Duke has purchased and deployed on its Ohio grid approximately 141,000 Ambient nodes.  While Ambient's nodes helped Duke achieve its smart grid initiative in Ohio, Ambient to date has been unable to monetize additional opportunities with Duke or elsewhere in the

marketplace, primarily as a result of Ambient's relative small size in the industry and general financial instability.

31.    The Debtor has funded negative cash flow primarily through an increase in borrowings from the Prepetition Facility, which as of the Petition Date had no remaining availability.  The Debtor's borrowings under the Prepetition Facility, and its inability to raise capital for operations from other sources, strained the Debtor's liquidity and, in turn, its ability to operate effectively.

**A.    The Debtor's Prepetition Search for Alternatives**

32.    In 2011, Ambient worked with various advisors on a planned Form S-1 Registration Statement filing.  The Debtor filed a Registration Statement on August 19, 2011, but subsequently withdrew it on April 17, 2012.  Immediately thereafter, the Debtor sought an outside professional advisor to assist in an assessment of the business and possible restructuring alternatives, including a capital raising initiative. The Debtor engaged Needham & Company LLC ("Needham"), an investment banking and asset management firm.  The Debtor believed that additional capital would help the Debtor pursue other opportunities in the industry.  Despite making some progress with potential financial investors, Needham's market search stalled and did not provide the capital infusion the Debtor needed.  Throughout this time period, the Debtor also engaged in several communications with potential investors, but was unable to secure the funding the Debtor needed.

33.    After it became clear that a financing initiative was unlikely, the Debtor began to search for strategic merger partners and, in connection with that effort, engaged Greentech Capital Advisors, LLC ("Greentech") in the third quarter of 2013.  Greentech is a nationally recognized investment banking firm with a focus on the efficient

infrastructure industry. With Greentech's help, the Debtor commenced an extensive market search. Specifically, Greentech prepared solicitation materials and identified 136 strategic parties that might have an interest in and the capability to consummate a merger with the Debtor. Greentech contacted those potentially interested purchasers, provided relevant materials, and offered access to further information upon execution of a confidentiality agreement. Of the initial group contacted by Greentech, six (6) companies expressed some level of interest and executed confidentiality agreements. Ultimately, no offers were received following the completion of due diligence. The Debtor believes that interested parties considered the Debtor's then-$27 million equity market capitalization too high.

### B.    Ericsson's Stalking Horse Bid

34.    The Debtor continued its efforts to find potential merger partners through March, 2014, with the assistance of its advisor, Trestle Capital Partners ("Trestle"). Specifically, Trestle continued the conversations, and tried to negotiate potential transactions, with the parties identified by Greentech. Three additional parties executed confidentiality agreements, but the Debtor did not receive any offers. In April 2014, the Debtor began talks with Ericsson regarding a potential sale transaction. The Debtor's working capital and availability under the Prepetition Facility continued to decline. The Debtor's management viewed a potential transaction with Ericsson, a competitor in the Debtor's industry, as the last remaining lifeline for the company to maximize the value of its assets.

35.    On June 30, 2014, Telefonaktiebolaget LM Ericsson (Publ), an affiliate of Ericsson, and the Debtor executed a letter of intent (the "LOI") expressing Ericsson's

interest in purchasing the Debtor.  The terms of the potential transaction were outlined more thoroughly in the June 26, 2014, Non-Binding Term Sheet attached to the LOI.

36.    Later on June 30, 2014, Ericsson supplemented the LOI with a draft asset purchase agreement that contemplated the sale of substantially all of the Debtor's assets through a Bankruptcy Code section 363 process.  Following subsequent negotiation of terms by and through professionals for the Debtor and Ericsson, the Debtor entered into that certain Asset Purchase Agreement dated July 28, 2014 (as may be modified, amended, or supplemented from time to time, the "APA") with Ericsson as the Debtor's proposed Stalking Horse Purchaser.  The APA provides for the sale of substantially all of the Debtor's assets to the Stalking Horse Purchaser for an aggregate consideration of $7.5 million, of which $2.5 million will be made available to the Debtor pursuant to the DIP Credit Agreement.  The Debtor's prepetition lender, Vicis, has consented to the priming of its liens by Ericsson pursuant to the DIP Credit Agreement to assist the Debtor in obtaining the funding necessary to continue as a going concern, and commence and prosecute this Chapter 11 Case for the benefit of the estate.

37.    The APA is subject to higher and better offers and conditioned on approval by the Court.  A copy of the APA is attached to the Debtor's bidding procedures and sale motion (the "Sale Motion"), filed contemporaneously herewith.  If approved, the sale will maximize the value of the Debtor's estate by ensuring the continued operation of the Debtor's business and development of its technology and products, preserving jobs, and resulting in the assumption and assignment of certain of the Debtor's executory contracts and leases, all to the benefit of the Debtor's stakeholders.

38.     As described more thoroughly in the Debtor's Sale Motion, section 4.5(e) of the APA contemplates a sixty (60) day sale process in this Chapter 11 Case.  Pursuant to that section, Ericsson may terminate the APA if the Debtor does not secure an Order approving the DIP Credit Agreement on an interim basis within ten (10) days of the Petition Date, an order approving the Debtor's proposed bidding procedures within twenty-one (21) days of the Petition Date, and an order approving the sale within seventy-five (75) days of the Petition Date.  Pursuant to section 7.3 of the APA, the Debtor has agreed to use its best efforts to secure an order from the Court approving the bidding procedures within ten (10) days of the Petition Date.  I believe that this timeframe is appropriate given the Debtor's prepetition marketing efforts and its inability to address its urgent liquidity issues.

39.     The APA incorporates various negotiated bidding procedures (the "Bidding Procedures"), pursuant to which the Debtor, with the assistance of its advisors, will solicit superior offers for its assets.  In general terms, the Bidding Procedures provide an opportunity for other interested purchasers to perform necessary diligence and submit competing bids.  The Debtor will conduct an auction if other bids are ultimately received.

40.     In consideration for the Stalking Horse Purchaser's expenditure of time and money and agreement to act as the initial bidder and the preparation of the APA, the APA and Bidding Procedures contemplate a break-up fee of $225,000 and expense reimbursement up to $350,000 for reasonable expenses incurred by the Stalking Horse Purchaser, including reasonable attorneys' fees (the "Bidding Protections").  The Bidding Protections, which are subject to the Court's approval, are payable by the Debtor to the Stalking Horse Purchaser subject to certain conditions identified in the APA.

41.     I believe that, after almost three years of exploring both potential financial and strategic alternatives, every party that reasonably could be expected to consummate a transaction with the Debtor was contacted by the Debtor or its advisors.  The parties that executed nondisclosure agreements during the prepetition process were granted access to substantially the same diligence materials the Debtor will use in the postpetition sale process.  Moreover, the Debtor's liquidity crisis necessitates a prompt and orderly sale to preserve and maximize going concern value.  Absent a prompt sale pursuant to the proposed procedures and timeline, the Debtor believes that the going concern value of the Acquired Assets will be significantly compromised, rendering the possibility of a sale unlikely and a liquidation of the enterprise likely.  The Debtor therefore submits that the proposed timeline is more than sufficient to complete a fair and open process that will maximize value for the Debtor's assets while at the same time preserve the going concern value.

42.     I believe that the Debtor's existing products and services can produce positive EBITDA and operating cash flow with opportunities for future growth.  Nonetheless, as a result of the factors discussed above, the Debtor has suffered a systematic decline in EBITDA, continues to operate at a net loss, and still experiences severe liquidity concerns as a result of consistently negative cash flow.  The Debtor cannot continue to function financially in the near term absent a sale of the business or financial restructuring.

43.     I further believe that, subject to higher and better offers, the APA represents the best available option for the continuation of the Debtor's business.  The APA allows for the Debtor's creditors to benefit from the going concern value of the

business, preserves jobs, and achieves assumption and assignment of certain of the Debtor's contracts and leases, results that would not be achieved in a liquidation scenario.

44.    As a result of the foregoing developments, the Debtor has on this date commenced the Chapter 11 Case and filed various administrative and operational First Day Motions, as further described herein.  Among the relief sought is interim and final approval of the DIP Credit Agreement to be provided by the Debtor's proposed Stalking Horse Purchaser.  I believe, based on my personal knowledge of the Debtor's affairs and my conversations with certain of the Debtor's management, Employees, and advisors, that absent approval of the relief sought, including DIP Credit Agreement authorization, the Debtor will be unable to continue operations on an uninterrupted basis, which in turn will jeopardize the Debtor's going concern value and any prospect of recovery to the Debtor's creditors.

## IV.    THE DEBTOR'S FIRST DAY MOTIONS

45.    I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in the First Day Motions, (b) the need for the Debtor to continue to effectively operate, and (c) the negative effects if the Debtor does not obtain the requested relief.  My opinions are based upon my first-hand experience, my review of the relevant documents, my discussions with other members of the Debtor's management team and the Debtor's advisors.

46.    I reviewed each of the First Day Motions and participated in the preparation thereof.  I believe, to the best of my knowledge, that the facts set forth in the voluntary petition and the First Day Motions are true and correct.  This representation is based upon information and belief and my thorough review of various materials and

information, as well as my experience and knowledge of the Debtor's operations and financial condition.   Based upon the foregoing, if called to testify, I could and would testify competently to the facts set forth in each of the First Day Motions.

47.     The relief sought in the First Day Motions will minimize the adverse impact of this case on the Debtor's customers, Employees, and suppliers, while allowing the Debtor to maximize value for its creditors.   I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate effectively as a debtor-in-possession.

48.     The APA contemplates the purchase of a going concern.   I believe that it is critical to the viability of the APA that the going concern value be preserved, that disruption of the business operations be kept to a minimum, and that all deadline dates be met.

49.     Some of the First Day Motions request authority to pay or otherwise honor certain prepetition claims.   I am advised that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "except to the extent relief is necessary to avoid immediate and irreparable harm," the court shall not consider motions to pay prepetition claims during the first twenty (20) days after the filing of a petition.   As set forth in more detail below and in the First Day Motions, I believe that the Debtor's requests for authority to pay prepetition claims are narrowly tailored to those circumstances where the failure to pay such claims would bring immediate and irreparable harm, or which would otherwise be entitled to administrative priority under the Bankruptcy Code.

A.      **Operational Motions**

**Cash Management/Bank Accounts Motion**

50.     By this motion, the Debtor seeks entry of an order, subject to the terms and conditions of the DIP Credit Agreement, (a) authorizing the continued use and maintenance of the Debtor's existing bank Account, (b) authorizing the continued use of the Debtor's business credit cards; (c) authorizing the Debtor to pay the Bank Fees (as defined in the motion), without regard to when such fees arose, (d) authorizing the continued use of the Debtor's existing business forms, and (e) waiving the requirements of section 345(b) of the Bankruptcy Code.

51.     As discussed above, the Debtor facilitates all of its operations through the Account, including inbound and outbound wires, payroll, checks, cash disbursements, cash receivables, and all other payables and receivables.  The Account enables the Debtor to collect, transfer, and disburse funds as needed and to accurately record all such transactions as they are made.  The Account maintained by the Debtor has been designed (i) to provide an efficient method of collecting, transferring, and disbursing funds; (ii) to establish procedures and controls necessary to account for funds in an accurate manner; and (iii) to facilitate satisfaction of the Debtor's financial obligations.  The Debtor maintains current and accurate accounting records of cash transactions; all funds received or disbursed by the Debtor are properly reflected on the Debtor's books and records.

52.     In order to minimize the disruption caused by this bankruptcy filing and maximize the value of its estate in this Chapter 11 Case, I believe it is vital that the Debtor maintain its current Account and system for managing its cash.

53.     The Debtor also seeks a waiver of the U.S. Trustee's requirement that its existing Account be closed and that a new postpetition bank account be opened.  If

enforced in this case, such requirements would cause significant disruption in the Debtor's business and would impair the Debtor's chapter 11 efforts.

54. The Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices), and checks existing immediately before the Petition Date without reference to the Debtor's status as debtor-in-possession. If the Debtor were required to change its correspondence, business forms, and checks, it would be forced to choose standard forms rather than the current forms with which those that do business with the Debtor is familiar. Such a change in operations would create a sense of disruption and potential confusion within the Debtor's organization, as well as with customers and suppliers.

55. I believe it is critical that the Debtor be granted the relief requested by this motion to minimize the disruption caused by this Chapter 11 Case. For these reasons and as more thoroughly provided in the motion, I believe, and the Debtor submits, that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors, and should therefore be approved.

**Motion to Pay Employee Wages, Benefits and Withholdings**

56. By this motion, the Debtor requests an order authorizing, subject to the terms and conditions of the DIP Credit Agreement, but not directing, the Debtor to pay or otherwise honor prepetition wages and salaries, and prepetition obligations, arising under various employee benefit and insurance programs, including reimbursable expenses, subject to caps set forth in the motion. The Debtor further seeks authority to continue

various employee benefit and insurance programs, as further described in the motion, in the ordinary course of business.

57.    The Debtor has costs and obligations with respect to its Employees relating to the period prior to the Petition Date.  By this motion, the Debtor requests authority to pay any wages and salaries accrued, but unpaid prepetition, on a postpetition basis, in an amount not to exceed $40,000.  The Debtor also seeks authority to continue its employee benefit programs, including reimbursement of certain expenses incurred by Employees, and generally make payments related thereto, in the ordinary course of business, in an amount not to exceed $10,000.  Finally, the Debtor requests authority to continue its 401(k) retirement plan in the ordinary course of business and to remit a contribution up to $25,000, to the extent not already drawn from the Debtor's Account, which represents the collective amounts withheld from the Employee's paychecks and the Debtor's matching obligations for its last pay cycle ending July 24, 2014.

58.    The Debtor is required by law to withhold certain amounts from its Employees' wages and to remit the same to the appropriate taxing authorities.  These withholding amounts relate to, for the Debtor's Employees, federal, state, and local income taxes, as well as social security and Medicare taxes.  The Debtor may also be required to withhold amounts from the Employees' wages for such items as court ordered child support payments, other attachments to wages, and government mandated savings plans.  In addition, the Debtor is required to make contributions of its own funds to the taxing authorities in the form of matching payments for its Employees on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for, among other things, state and

federal unemployment insurance. I believe that the current practice of directing such funds to the appropriate parties is in the ordinary course of business and appropriate on a postpetition basis.

59. The Debtor also seeks authorization directing all banks and payroll services to receive, process, honor, and pay any and all checks related to wages and benefits, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the Debtor's Account to cover such payments.

60. There can be no doubt that the Debtor's Employees are a substantial component to the uninterrupted operation of the Debtor's business during this Chapter 11 Case. For these reasons and the others described more thoroughly in the motion, I believe the relief sought in this motion is necessary to avoid immediate and irreparable harm, including, but not limited to, the loss of Employees and the potential shutdown of operations.

**Insurance Motion**

61. By this motion, the Debtor seeks an order authorizing the Debtor to maintain existing insurance policies, pay all policy premiums and fees arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed, subject to the terms and conditions of the DIP Credit Agreement.

62. The Debtor maintains numerous insurance policies (each a "Policy" and collectively, the "Policies") through several different carriers in the ordinary course of its businesses. In particular, the Debtor's Policies include, *inter alia*, property and general liability, commercial automobile, umbrella, employment practices liability, marine cargo, and coverage for the Debtor's directors and officers. The Debtor's Policies are essential

to the preservation of its businesses, properties, and assets, and in many cases, such Policies are required by applicable regulations, laws, and contracts governing the Debtor's business and operations.

63.     The Debtor pays premiums in connection with the Policies in varying frequencies.  The Debtor believes it is current on its payments under each Policy as of the Petition Date, but out of an abundance of caution, seeks authority to pay any prepetition amounts outstanding and amounts relating to the prepetition period that may come due postpetition, including brokers fees, up to a cap of $10,000.  The Policies are essential to the Debtor's businesses and the Debtor believes it is in the best interests of its estate to permit the Debtor to honor its obligations under the current Policies.   Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtor's efforts to preserve and maximize the value of its assets for the benefit of the estate.

64.     For these reasons and as more thoroughly provided in the motion, I believe, and the Debtor submits, that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors and should therefore be approved.

**DIP Credit Agreement/Cash Collateral Motion**

65.     The Debtor does not currently have access to the funds it needs to operate its business.  Further, the Prepetition Facility is fully drawn and the Debtor is operating under an extended maturity date with the Prepetition Lender.  As described more fully in the motion, the Debtor has obtained a $2,500,000 DIP Credit Agreement from the Stalking Horse Purchaser that will allow the Debtor to operate during this Chapter 11

Case.  The Debtor has also obtained agreed terms for its use of cash collateral with the Stalking Horse Purchaser.

66.     I believe that the DIP Credit Agreement represents the best terms currently available to the Debtor, and that the financing being provided by the Stalking Horse Purchaser (including the use of cash collateral) is necessary to continue operations postpetition and consummate a going concern sale of the Debtor's assets.

67.     The DIP Credit Agreement is critical to the success of this case.  The Debtor is operating under an extended maturity date on its Prepetition Facility with Vicis and is experiencing a significant liquidity shortfall.  It is therefore necessary for the Debtor to obtain new liquidity, substantially on the terms provided in the DIP Credit Agreement, and be permitted to use cash collateral, to maintain its business operations, and in turn, the going concern value of this estate pending consummation of a sale. Absent the financing provided for in the DIP Credit Agreement, I believe that the Debtor will soon not be able to meet its direct operating expenses and would face the prospect of a complete cessation of operations and liquidation.  Such a result would undoubtedly cause immediate and irreparable harm to this estate by eliminating going concern value and any possibility of completing the sale, all to the detriment of the Debtor's creditors and stakeholders.

68.     After an extensive search dating back to 2012, a process in which I was integrally involved, I believe that the Debtor is unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1)

of the Bankruptcy Code, without the grant of liens on assets.  The Debtor has been unable to procure the necessary financing on terms more favorable than the financing offered by the Stalking Horse Purchaser pursuant to the DIP Credit Agreement.  Moreover, the Debtor's Prepetition Lender has consented to the priming of its liens by the liens provided in the DIP Credit Agreement.

69.     For these reasons and as more thoroughly provided in the motion, I believe, and the Debtor submits, that the relief requested in this motion is in the best interests of the Debtor, its estate, and its creditors and should therefore be approved.

### B.     Retention Application

### Claims and Noticing Agent

70.     This application seeks an order appointing UpShot Services, LLC ("UpShot") as the claims and noticing agent to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's Chapter 11 Case.

71.     I believe, based on my discussions with the Debtor's advisors, that the Debtor's selection of UpShot satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I believe based on all engagement proposals obtained and reviewed, that UpShot's rates are competitive and reasonable, given the quality of services and expertise.  The terms of retention are set forth in the Engagement Agreement attached to the retention application.

72.     The Debtor seeks retention of UpShot solely in accordance with the terms and provisions as set forth in the retention application and the proposed order attached

thereto.   Although the Debtor has not yet filed its schedules of assets and liabilities, I anticipate that there will be approximately 75 creditors and over 7,000 shareholders to notice in this Chapter 11 Case.   In view of the number of anticipated claimants and interest holders, I believe that the appointment of a claims and noticing agent is in the best interests of the Debtor's estate and its creditors and interest holders.

*[remainder of page intentionally blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: July 28, 2014

By:_____
John J. Joyce